SCHMIDT, LONG AND ASSOCIATES, INC., Plaintiff,

v.

UNITED PARCEL SERVICE, Defendant.

No. 3:001CV7203.

United States District Court, N.D. Ohio, Western Division.

July 30, 2002.

Barry W. Fissel, Henry N. Heuerman, James F. Nooney, Kevin D. Devaney, Eastman & Smith, Toledo, OH, for Schmidt, Long and Associates, Incorporated, plaintiff.

Hugh E. McKay, Leo M Spellacy, Patricia F. Jacobson, Porter, Wright, Morris & Arthur, Cleveland, OH, for United Parcel Service, defendant.

John T. Landwehr, Eastman & Smith, Toledo, OH, for DaimlerChrysler Corporation, interested party.

## ORDER

CARR, District Judge.

This is a contract case between Schmidt, Long and Associates, Inc.(SLA) and United Parcel Service (UPS). Pending are plaintiff's motion for partial summary judgment as to count one of the complaint and defendant's cross-motion for summary judgment as to that count and count three of the complaint.[1]

For the reasons that follow, the plaintiff's motion shall be denied, and the defendant's motion shall be granted.

Plaintiff SLA conducts audits of the records of health insurance companies to determine whether they have retained, or otherwise failed to remit, monies owed to employers, including employers like UPS, who self-fund health insurance for their employees. Where the employer self-funds its health benefit program, it will contract with a health insurance company to administer the program. Where such arrangement exists, the insurance company is referred to as the Medical Benefits Plan Administrator (administrator).

As a result of such arrangements between BCBS and UPS, UPS employees get health care coverage, BCBS administers the employees' claims—i.e., tells the employer how much to pay for the service received by the UPS employee—and UPS pays that amount.

BCBS also had contracts with health care providers which provided for discounted payments to the providers, so that the provider would receive something less than 100% of the amount billed to the covered employee. Pursuant to UPS' contract with BCBS, the discount was to be passed through to UPS.[2]

Not infrequently, however, the employer did not get the benefit of the provider discount. SLA is in the business of auditing medical benefit plan administrators, such as BCBS, to determine whether the discounts have properly been passed through the employer.

On November 11, 1999, SLA and UPS signed a "Medical Claims Audit Agreement," whereby SLA agreed to audit UPS' medical benefits plan administrators with respect to the "Medical Claims Pricing Discounts" received by the administrators. (Doc. 56, Exh. A). The purpose of the audit was to "assure [UPS] that [the administrators] properly accounted for such discounts in the pricing of claims charged to" UPS and its employees.

The first paragraph of the contract required, inter alia, SLA to investigate the administrators' "practice of retaining certain reimbursements from health care providers and perform various claims auditing services....." If SLA "determine[d] that [the administrators] may have retained reimbursements which should have been shared with [UPS]," SLA was to "pursue the recovery of the amounts owed to

---

1. In an earlier decision, I granted defendant's motion to dismiss counts two and four.

2. A simplified example: a hospital bills an employee for $1,000, and the employee submits that bill to BCBS. BCBS has a contract with the hospital, whereby the hospital discounts its bill, and accepts something less than the $1,000 billed to the employee—$800, or $500, or whatever amount, less than the full bill, it has agreed to accept as payment in full. The employer is to receive the benefit of the discount negotiated between BCBS and the provider—i.e., the $200 or $500 discounted by the provider pursuant to its contract with BCBS.

[UPS] by [the administrators]...." That paragraph also provided that neither SLA nor UPS would "conclude any recovery settlement with [administrators] without prior written notification to and consultation with the other party...."

The second paragraph of the contract defined how SLA was to be compensated: UPS agreed to pay certain specified amounts, depending on the total of the ultimate recovery from BCBS, "from any reimbursements or credits obtained for the benefit of [UPS] from [administrators] by [SLA] obtained *as a result of work performed by*" and "*as a result of actions taken or recommended by*" SLA. (Emphasis added). That paragraph also provided that all payments were to be made to a lock box account maintained jointly by SLA and UPS.

The third paragraph stated that during the pendency of the contract, SLA had "the exclusive right and authority to pursue recovery of [UPS'] claims against [administrators] for failure by [administrators] to properly account for claims...."

The fifth paragraph stated:

In the event that [UPS] terminates this Agreement, [UPS] agrees to pay [SLA] all sums due [SLA] pursuant to Paragraph 2. of this Agreement as to the refunds and or credits actually received by [UPS] *due to actions taken or recommended by* SLA whether actual recovery is made prior to or following the termination of this Agreement.

Shortly after the parties signed the agreement, SLA began the initial steps of its audit process. It encountered a significant roadblock when one of the BCBS entities it sought to audit declined to provide it with information unless SLA signed an Audit and Indemnification Agreement with that entity. This and other problems relating to the production of necessary information, which was not available until mid-October, 2000, kept SLA from starting its audit for nearly a year after it and UPS had signed their agreement. By December, 2000, however, SLA had proposed to BCBS that it compromise alleged overpayments of $18 to $30 million. On January 16, 2001, BCBS rejected SLA's proposal.

In the meantime, BCBS was conducting a self-audit of its records. On September 6, 2000, BCBS notified UPS of a "Financial Settlement" in the amount of $2,429,009.02. BCBS paid that amount, which was derived from access fees [3] and discounts for 1998 and 1999, to UPS in October, 2000. BCBS later made additional payments in lesser amounts to UPS, with the total of all payments being $2,858,875. Neither BCBS nor UPS notified SLA of these payments, which were not paid into the lock box maintained by UPS and SLA. Nor has UPS paid any portion of the settlements to SLA.

On April 13, 2001, UPS exercised its right, as allowed under Paragraph 5 of the Agreement, unilaterally to terminate the Agreement.

SLA claims that UPS, by accepting the payments from BCBS, breached several provisions of its agreement with SLA: 1) SLA's "exclusive right and authority to pursue recovery of Claims against" administrators, as specified in ¶ 3; 2) the requirement of mutual consent before set-

---

**3.** An "access fee" is an amount charged by some local health care plans for access by large multi-state employers to a state plan's PPO (preferred provider organization). The access fee is a percentage of the local plan's health care provider discount. BCBS agreed to waive these fees for UPS, which therefore was entitled to reimbursement for any access fees that may have been charged by a local plan. For purposes of this decision, it is not necessary to resolve the parties' dispute about the nature of the access fee and the effect of remission of that fee through the reconciliation process.

tlement or compromise of "any claim or settlement," as specified in ¶ 1; and the obligation to cause any recoveries from BCBS to be paid only into the jointly maintained lockbox. SLA seeks thirty-five percent of the amount received by UPS in accordance with the formula specified in Paragraph 2 of the Agreement.

In response, UPS asserts that the disputed payments were unrelated to the discounts that were the exclusive subject, according to UPS, of its agreement with SLA. Unlike outside audits, such as that which was to have been conducted by SLA, the process leading to the disputed payments involved, according to UPS, a self-audit, or reconciliation undertaken by BCBS of its own accord. UPS asserts, further, that this process was routine, had begun before it and SLA entered into their contract, and was instituted independently by BCBS.

UPS also points to the provision in paragraph 2 of its agreement with SLA, which limits SLA's compensation to a percentage "from any reimbursements or credits obtained for the benefit of [UPS] from [administrators] by [SLA] obtained *as a result of work performed by*" and "*as a result of actions taken or recommended by*" SLA.

The parties agree that none of the funds at issue resulted from SLA's work prior to the termination notice in April, 2001.

Two provisions of the UPS/SLA contract are at issue: the first, giving SLA "the exclusive right and authority to pursue recovery of [UPS'] claims against [administrators] for failure by [administrators] to properly account for claims ...," and the second, basing compensation on amounts recovered by SLA.

Under this contract, where SLA had not "pursued recovery," it would not get paid. It alone could "pursue" recovery; UPS committed itself to refraining from doing so. Where, however, recovery originated otherwise than it having been "pursued," such recovery was outside the contract, and UPS had no obligation to pay a portion of the proceeds to SLA under the contract.

■ While SLA has shown (and UPS does not dispute) that UPS received substantial payments from BCBS without notifying SLA, obtaining its approval, or passing those funds through the joint lock box, there is no showing in this record that UPS "pursued" recovery of those payments. There is no evidence of any demand, request, or even inquiry on UPS' part with regard to these monies.

BCBS may, in part, have sent these monies to UPS to short-circuit SLA's audit, and thereby defeat SLA's expectations under the contract. But any such intent on its part cannot be attributed to UPS, absent some showing, beyond the speculation offered by SLA, that UPS provoked or participated in the reconciliation process, and thereby "pursued" recovery through that process in violation of its contractual commitment to SLA that it alone could pursue any recovery.

UPS has submitted affidavits from several BCBS employees describing the process by which its reconciliation procedures functioned, and how those procedures led to the payment for which SLA seeks to be compensated. BCBS had used these procedures since 1994, and the process leading to the contested payments had begun before the UPS/SLA contract was entered into. Though SLA was aware of BCBS' reconciliation practice, it did not assert a claim for compensation as to the proceeds of that practice until after BCBS' January 16, 2001, rejection of SLA's December, 2000, settlement demand.

There is no reason to believe, much less to find on the basis of uncontested facts, that UPS breached the exclusivity provision of its contract with SLA.

The limitation of SLA's compensation to monies recovered through work done by it can, moreover, have meaning only if it is interpreted to exclude any claim by SLA to monies that come from procedures other than its audit and a resulting recovery. This conclusion simply reflects the basic doctrine that "a writing, or writings executed as part of the same transaction, will be read as a whole, and the intent of each part will be gathered from a consideration of the whole." *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Authority,* 78 Ohio St.3d 353, 361, 678 N.E.2d 519 (1997). "In matters of construction, '\*\*\* it is the duty of this court to give effect to the words used, *not to delete words used or to insert words not used.*'" *Cleveland Elec. Illuminating Co. v. City of Cleveland,* 37 Ohio St.3d 50, 524 N.E.2d 441, 445 (1988) (citing *Columbus–Suburban Coach Lines v. Pub. Util. Comm.,* 20 Ohio St.2d 125, 127, 254 N.E.2d 8 (1969)) (emphasis in original). *See Prudential Ins. Co. of Am. v. Corporate Circle, Ltd.,* 103 Ohio App.3d 93, 98, 658 N.E.2d 1066 (1995).

Applying this fundamental principle, I conclude that under its agreement with UPS, SLA can only be compensated where it pursued and obtained a recovery of monies from BCBS.

There has been, in any event, no showing of a breach of SLA's exclusive right to purse recovery of funds owed to UPS by BCBS. There being no such breach, and no monies recovered by SLA, its motion for partial summary judgment must be denied, and UPS' motion for summary judgment as to the remaining claims must be granted

It is, therefore,

ORDERED THAT plaintiff's motion for partial summary judgment be, and the same hereby is denied; defendant's motion for summary judgment be, and the same hereby is granted.

So ordered.